1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RUSSELL CORBIN,

12          Plaintiff,                No. CIV S-07-2241 EFB

13      vs.

14   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
15
            Defendant.              ORDER
16   _____/

17          Plaintiff filed this action seeking review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying his applications for Disability Income Benefits and

19   Supplemental Security Income under Titles II and XVI of the Social Security Act, respectively.

20   Pending are the parties' cross-motions for summary judgment.[1]  For the reasons discussed below,

21   the court grants plaintiff's motion and denies defendant's motion.  This case is remanded to the

22   Commissioner for entry of judgment directing the payment of benefits to plaintiff.

23   ////

24   _____

25       [1]  On June 10, 2008, plaintiff moved for summary judgment (docket no. 23).  On July 9,
     2008, defendant filed an opposition and cross-motion for summary judgment (docket no. 24).
26   Plaintiff did not file an opposition to defendant's motion or a reply in support of his own motion,
     as authorized by the Local Rules and by the order filed November 1, 2007.

## I.    BACKGROUND

Plaintiff, born on January 10, 1957, applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on June 30, 2003, based on a disability onset date of June 16, 2003.  Administrative Record ("AR") at 78-81, 23.  On August 24, 2003, the Commissioner denied plaintiff's applications based on a finding that plaintiff was not disabled.  AR 59-62.  Plaintiff's request for reconsideration was denied by the Commissioner on December 5, 2003.  AR 67-71.  On December 15, 2003, plaintiff formally requested a hearing.  AR 72-73.

On July 21, 2004, the first of two hearings was held before administrative law judge ("ALJ") Plauche F. Villere.  AR 358-80.  Plaintiff was represented by counsel at the hearing, and was the only person to testify.  *Id*.  The ALJ issued a decision on February 7, 2005, finding that plaintiff is not disabled.[2]  AR 42-56.  The ALJ made the following specific findings:

---

[2]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq*.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. §§ 1382 *et seq*.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) and 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's aortoiliac occlusive disease involving the bilateral lower extremities, lumbar degenerative disease, bipolar disorder, and alcohol and drug dependence in sustained full remission are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision. The undersigned has carefully considered all medical opinion of record regarding the severity of the claimant's symptoms.

6. The claimant retains the residual functional capacity to perform a wide range of unskilled sedentary work that does not require the operation of foot controls. In an 8-hour workday, the claimant could sit for 6 hours and stand/walk for 2 hours with breaks. He requires the use of a cane for ambulating long distances or over uneven terrain. He could lift and/or carry and push/pull 10 pounds frequently and 20 pounds occasionally. He could bend, stoop, squat, crouch, crawl, and climb stairs or ramps occasionally. He is precluded from climbing ladders, ropes, or scaffolds. He should avoid frequent interaction with co-workers and the public.

7. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

---

evaluation process proceeds to step five. *Id.*

11. The claimant has the residual functional capacity to perform substantially all of the full range of unskilled sedentary work (20 CFR §§ 404.1567 and 416.967).

12. Based on an exertional capacity for a wide range of unskilled sedentary work, and the claimant's age, education, and work experience, Medical-Vocational Rule 201.19, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

13. The claimant's capacity for sedentary work is substantially intact and has not been significantly compromised by any nonexertional limitations. Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

AR 45-56.

Plaintiff requested that the Appeals Council review the ALJ's decision. AR 313-14. On October 19, 2005, the Appeals Council granted plaintiff's request for review, vacated the hearing decision, and remanded the case for further proceedings. AR 315-18. The Appeals Council stated:

The Administrative Law Judge (ALJ) found, in relevant part, that the claimant's mental impairment precludes frequent interaction with co-workers and the general public (finding #6). The ALJ then found the claimant is precluded from returning to any of his past relevant work. Upon consideration of his vocational profile and residual functional capacity, the ALJ determined that Rule 201.19 of Table 1, Appendix 2, Subpart P of Social Security Administration regulations No. 4, is applicable and this rule provides the framework for concluding that the claimant is not disabled. The decision reflects that input from a vocational expert (VE) was not obtained. Given that the claimant is limited to occasional interaction with co-workers and the public, input from a VE is needed to ascertain the impact such limitations have on the claimant's occupational base.

In addition, the record contains a consultative psychiatric report dated September 27, 2004, from Timothy Canty, M.D. This report was addressed but it was not completely summarized or evaluated (page 6 ¶ 2). Specifically, Dr. Canty indicated that the claimant's "history is consistent with frequent episodes of major depression occurring four to six times per year which have not remitted with

4

extensive psychiatric care and abstinence from alcohol. If he continues on this pattern it would be difficult to imagine him being able to keep a typical job with typical expectations" (exhibit 10F/4). This aspect of Dr. Canty's opinion was not noted in the decision. Accordingly, Dr. Canty's opinions need to be addressed and cogent reasons given for the probative value determined.

The record also contains statements from the claimant's sister, Bonnie Bell, (exhibit 1E), which should be addressed.

***

Upon remand the Administrative Law Judge will:

• Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the examining source opinion pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the examining source to provide additional evidence and/or further clarification of the opinion and medical source statements about what the claimant can still do despite the impairment (20 CFR 404.1512 and 416.912).

• Evaluate the lay statements made by the claimant's sister, Bonnie Bell, pursuant to the adjudicative provisions set forth in 20 CFR 404.1513(d)(4) and 416.913(d)(4) as part of the assessment of the claimant's credibility.

• Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

AR 316-17.

////

A supplemental hearing was then held before ALJ Villere on August 21, 2006. AR 381-410. Plaintiff was again represented by counsel at the hearing. Vocational Expert ("VE") Mr. Clark and medical experts Drs. Doren and Walther testified. *Id.* On November 13, 2006, the ALJ again denied plaintiff's disability benefits. AR19-33. The ALJ found:

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant's back and hip pain, peripheral vascular disease, bipolar, and post traumatic stress disorder are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).
>
> 4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.
>
> 6. The claimant can perform sedentary unskilled work and simple 1-3 step jobs. He can stand/walk two hours with breaks in an eight hour workday, he can sit six hours with breaks in an eight hour workday. He can occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. [He] is limited in lower extremities. He can occasionally climb ropes, stairs, ladder rope, scaffold, balance, kneel, crouch and crawl. He can perform unskilled, simple one-three steps with little public contact. He has moderate limitations in his ability to understand and remember short, simple instructions, carry out short, simple instructions, understand and remember detailed instruction, carry out detailed instructions, make judgments on simple work-related decision. Furthermore, he would have moderate limitations in his ability to interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting.
>
> 7. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

////

8. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

12. Using Medical-Vocational Rule 201.19 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

AR 31-32.

Plaintiff requested that the Appeals Council again review the ALJ's decision, and on August 22, 2007, the Appeals Council denied review. AR 8-11, 16-17.

II. MEDICAL EVIDENCE

From May 4, 2001 to April 3, 2002, Dr. Mohammad Shoiab, M.D., at Behavioral Health Specialists in Nebraska, treated plaintiff with medications and therapy for bipolar disorder and adjustment disorder with mixed anxiety and depressed mood. AR 147-54. On May 4, 2001, Dr. Shoiab determined that plaintiff had a Global Assessment of Functioning ("GAF") of 50.[3] From January 16, 2002 through December 26, 2002, plaintiff continued treatment with medications for bipolar disorder at El Dorado County Mental Health. AR 161-68. On January 30, 2002, Dr.

---

[3] The GAF Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." The American Psychiatric Association's Multiaxial Assessment, set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th Ed. 2005), at 34. A GAF of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

Clyde Martin, M.D., of El Dorado County Mental Health, found that plaintiff had a GAF of 50. From September 2002 through May 2004, plaintiff received treatment with medications from Sutter-Yuba Mental Health Service for a mood disorder. AR 169-96. On October 31, 2002, Sutter-Yuba Mental Health Service determined that plaintiff had a GAF of 53.[4] AR 194.

Plaintiff was treated at Del Norte Clinics, Inc. from November 22, 2002 to November 26, 2003 for hypertension, hip pain, knee pain, chronic bronchitis, and back pain. AR 233-51. Dr. Hari Goyal, M.D., diagnosed plaintiff with peripheral vascular disease, and an x-ray of plaintiff's lumbar spine indicated he has "mild degenerative disease." AR 233, 245. Del Norte Clinics discharged plaintiff for "noncompliance."[5] AR 258.

On August 18, 2003, non-examining state agency physician E. Harrison, M.D., completed a psychiatric review technique form and mental residual functional capacity assessment of plaintiff. AR 197-214. Dr. Harrison indicated that plaintiff had bipolar syndrome and an anxiety disorder. AR 200, 202. He opined that "[d]ue to bipolar & anxiety, [plaintiff is] limited to sustaining only simple SGA [substantial gainful activity] with little public or coworker contact." AR 213.

On January 7, 2004, Gilbert A. Martinez, M.D., at Feather River Tribal Health, diagnosed plaintiff with peripheral arterial disease/peripheral vascular disease, hypertension, benign prostatic hypertrophy, depression, and PTSD/attention deficit/hyperactivity disorder/bipolar. AR 259.

On February 25, 2004, James W. Holcroft, M.D., from UC Davis Health System, Division of Vascular Surgery, evaluated plaintiff's vascular disease and leg pain. AR 220-23.

////

---

[4] A GAF of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

[5] Although the medical records indicate plaintiff was discharged from Del Norte Clinics for "noncompliance," it is not clear why he was deemed "noncompliant."

Dr. Holcroft noted that plaintiff had a "vague diagnosis" of lumbar disc disease and that Plaintiff had hypertension. AR 220. He suggested vascular surgery ("possible dilation and stent placement") to treat plaintiff's vascular problems. AR 223. On March 31, 2004, Dr. Holcroft noted that plaintiff's iliac arteries had been stented and dilated and that after the procedure his arteries were unobstructed, plaintiff had excellent and strong pulses in his right foot, and plaintiff's left foot was "warm and well-perfused." AR 215.

<u>September 27, 2004, SSA Psychiatric Consultative Examination – Timothy Canty, M.D.</u>

On September 27, 2004, plaintiff described to Dr. Timothy Canty, M.D., an abusive childhood, the death of his parents when he was 13, joining the military at 17, two tours of duty in Vietnam, and serving time in prison where "he was repeatedly raped." "He describe[d] periods of isolation and low mood with fearfulness lasting several weeks at a time occurring four or five times per year. The psychiatric medications have lessened the length of these periods. He occasionally has memories of Vietnam and these can occur from several times per month to only once or twice per year." AR 272. His current medications were indicated to be Paxil, Neurontin, and Trazodone. AR 273. "His last paid job was working construction in 2001, and this ended after he had a 'melt-down' and was fired." *Id.* Plaintiff described to Dr. Canty "discreet periods of depression [that] come on over a period of a day or two, become severe for many days, and then resolve over a several-day period. The whole episode lasts several weeks." AR 274. It was Dr. Canty's opinion that:

> Over the last six years he has been sober and he continues to describe periods that would qualify for major depressive episodes. He has PTSD symptoms but their frequency and severity at this time do not qualify for the diagnosis of PTSD. He is currently euthymic but does describe having a recent depressive episode. He is clearly quite functional when not depressed and is in essence working as the manager of a halfway house, which certainly cannot be an easy job. However, during his periods of depression, he would be unable to perform most typical jobs and he has gravitated toward jobs that allow him quite a bit of flexibility.

AR 275. Dr. Canty added that:

When not in a depressive episode he would be able to perform many typical jobs. However, his history is consistent with frequent episodes of major depression occurring four to six times per year which have not remitted with extensive psychiatric care and abstinence from alcohol. If he continues on this pattern it would be difficult to imagine him being able to keep a typical job with typical expectations. During his periods of normal mood he would be able to attend and complete many jobs but during his major depressive episodes he clearly would not. Thus, his level of functioning is quite episodic. It is important to remember that these episodes are self-reported and historic in nature and he did not appear even slightly depressed today.

AR 275.

Dr. Canty also concluded that plaintiff's ability to understand, remember and carry out instructions was affected by his impairments, and that plaintiff was moderately impaired in the following abilities: understanding and remembering short, simple instructions; carrying out short, simple instructions; understanding and remembering detailed instructions; carrying out detailed instructions; making judgments on simple work-related decisions. AR 276. Dr. Canty also found that plaintiff's ability to respond appropriately to supervision, co-workers and work pressures in a work setting was impaired, and that plaintiff was moderately restricted in the following areas: interacting appropriately with the public; interacting appropriately with supervisor(s); interacting appropriately with co-workers; responding appropriately to work pressures in a usual work setting; and responding appropriately to changes in a routine work setting. AR 277. Dr. Canty determined that plaintiff had a GAF of 65 to 70.[6]

October 25, 2004, SSA Internal Medicine Examination – John Tendall, M.D.

On October 25, 2004, plaintiff reported to Dr. John Tendall, M.D., that he had back and hip pain, that he had posttraumatic stress disorder and was bipolar, and that his left leg was cold, numb and burning. AR 279. Dr. Tendall diagnosed plaintiff with: (1) peripheral arterial

---

[6] A GAF of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has meaningful interpersonal relationships."

insufficiency with bilateral femoral stent placement, (2) back pain possibly secondary to degenerative disk disease or degenerative joint disease, (3) hypertension, and (4) hepatitis. AR 283. Dr. Tendall opined that plaintiff "probably should have a recent vascular reassessment for more delineation of his runoff flow" and determined that plaintiff could be expected "to stand and walk two hours in a workday with breaks [and] to sit for six hours with breaks," and "perhaps could use an assistive device of a cane for long distances or uneven terrain." AR 283. Dr. Tendall further opined that plaintiff "could lift and carry 10 pounds frequently and 20 pounds occasionally [and] would have limitations on bending, stooping, and crouching and he could perform these only occasionally." *Id.*

On January 11, 2006, after reviewing an assessment prepared by an evaluator, a psychiatrist or psychologist from ValueOptions, a mental health provider, determined that plaintiff was eligible for its "Seriously Mentally Ill" mental health benefit package. AR 341. During the assessment (AR 341-57), plaintiff stated that he needed medication and a psychiatrist (AR 350), that he avoided social contact (AR 349), and that even on medication he felt paranoid and afraid to leave the house at times (AR 349). Plaintiff also said that he needed "assistance with social security." AR 350.

Plaintiff was treated at the Family Medicine Center in Phoenix, Arizona from March 17, 2006 through June 6, 2006. AR 330-35. He was treated for hypertension, back and leg pain, and hepatitis. AR 330-35.

III.  SUMMARY OF TESTIMONY AT ADMINISTRATIVE HEARINGS

A.  June 21, 2004 Hearing

Plaintiff was the only person to testify at his July 21, 2004 hearing. AR 358-380. Plaintiff confirmed that he was born on January 10, 1957. AR 361. He answered that he went through 10th grade, did not have a GED, and was able to read and write "some." AR 362. He stated that during the past 15 years he worked as a hod carrier in masonry and performed carpentry. He explained that most of his jobs had lasted less than a year and he had no

11

1  specialized training of any kind.  AR 376, 377.  Plaintiff told the ALJ that he had been clean and

2  sober from drugs and alcohol for six years.  AR 370.

3  Plaintiff testified that he drove, but was unable to drive during his "meltdown" periods,

4  which were stretches of time when he was unable to leave his house.  AR 362, 363.  Plaintiff

5  related that, to the best of his recollection, he last worked a couple of years ago as a carpenter.

6  He stopped work because of the physical pain he was feeling in his legs and because of the

7  "paranoia [he] was feeling about, not just being in [his] car to go to work, but having to be near

8  people when [he] got there.  It was just so overwhelming that [he] couldn't go through with it,

9  so, consequently, they fired [him]."  AR 363.  Plaintiff confirmed that June 16, 2003, was the last

10  day he worked.

11  Plaintiff testified that he had pain in his lower back which caused the numbness and pain

12  in his hips.  He explained that these problems were the first physical signs that warned him he

13  could no longer do construction work.  Plaintiff testified that he had vascular circulation

14  problems that had prevented him from standing, but after surgery his legs were receiving a slight

15  amount of circulation.  AR 367.  He clarified that it is "one of the worst pains you'll ever

16  experience."  AR 368.  Plaintiff related that the stents that were put in reduced the pain in his

17  legs, "but the pain is still there and it's still pretty bad."  AR 378.  He pointed out that he had

18  feeling in his right foot, but his left foot was numb and had no feeling, except for the toes which

19  were "still numb and tingly . . . If anything touches my feet, it causes a searing pain through my

20  feet that is pretty bad too.  It's like somebody poking with a hot poker or something."  AR 378.

21  Plaintiff testified that he had problems sitting and was only able to sit for a half-an-hour

22  or so before he had to get up and move around.  He estimated he could sit for six hours a day if

23  he was able to get up and move around periodically.  AR 368, 369.  He indicated he was able to

24  stand for "a couple of minutes," and then had to sit down for 15 to 20 minutes before he could

25  get up again.  AR 370.  He testified that he was able to walk about 100 feet, or about one-quarter

26  of an eight-hour day.  He pointed out that he had to lay down about three times a day for 45

minutes to an hour. Mr. Corbin related he could lift as much as two gallons of milk and could lift one gallon of milk two or three times an hour "if I really wanted to push it." AR 372. He testified that he could not push a grocery cart, but could pull a door open or pull a chair out. Plaintiff explained that stooping or bending at the waist was painful; he was unable to squat or kneel on either leg; did not go near ladders; crawling was extremely painful, but was able to reach in all directions. AR 372, 373. He testified that twisting and moving his body caused pain, and his hands worked "okay" although his left hand and fingers were numb from poor circulation, and he was left handed. AR 373, 374.

Plaintiff also reported that he suffered from bipolar disorder. "It is my bipolar disorder which causes me to have really bad mood swings, intolerance of others and also very bad depression as well. You know, I exclude myself from the world at large and just kind of hide out for months on end because I don't know what to do, I'm afraid to go anywhere." AR 367. He also testified that he thought he suffered from PTSD "because of some pretty bad stuff that happened throughout my life." Plaintiff was unable to point out exactly what the precipitating incidents were but related that he was a soldier in Vietnam dealing with corpses; grew up in an alcoholic and drug addicted family where violence was commonplace; sexual, mental, physical, and emotional abuse had been perpetrated on him. He clarified that his parents died when he was 13 from alcoholism, at which time he was orphaned and had been on his own ever since. AR 363, 364.

He reported that his current medications included: Neurontin, Seroquel, Trazodone, Hydrochlorothiazide, MetaCarb, and Vicodin. AR 377. He indicated that his medications helped with his impairments but that when he goes into a "meltdown" period, he needed five to six months to get back on track with medications. AR 377-78.

B. August 21, 2006 Hearing

At the August 2006 administrative hearing (AR 381-410), orthopedic medical expert witness Dr. Walter Doren testified (AR 383-93). Dr. Doren said that upon review of plaintiff's

13

medical records, he felt that plaintiff could "stand intermittently in the vicinity of 6 hours as long as he had breaks." AR 389. Because of plaintiff's peripheral vascular disease, Dr. Doren opined that plaintiff would be limited to walking 2 to 4 hours as long as he took breaks. AR 390. Dr. Doren also testified that on the basis of the records, plaintiff would be able to walk a block at one time. AR 390. Dr. Doren also stated that plaintiff could lift and carry 10 to 15 pounds frequently or 20 to 30 pounds occasionally, had no manipulative limitations, but his bending, stooping, and crouching would be limited to only occasionally. AR 389. Dr. Doren further testified that plaintiff could sit without limitation. AR 392, 393.

Medical expert Sidney Walther, Ph.D., then testified as to plaintiff's mental condition. AR 393-99. Dr. Walther stated that plaintiff did not have limitations because of the medication he took for bipolar disorder and that he could do "very simple tasks, one to three steps." AR 394. Dr. Walther noted that plaintiff was currently doing such tasks. AR 394-95. He also stated that plaintiff's bipolar patterns seemed to be under control. AR 395. He stated that plaintiff would "have limitations, but they would not render him to be non-functional." AR 398, 399.

Vocational expert ("VE") Jeff L. Clark also testified at the hearing. AR 399-409. Mr. Clark testified that plaintiff would not be able to do his past relevant work. AR 401. The ALJ posed the first hypothetical question to the VE based on the opinion of examining physician Dr. Tendall (AR 279-84). AR 401. The VE testified that there would be unskilled, sedentary jobs available for someone with these limitations. AR 401. Plaintiff's attorney stipulated that there would be enough of these types of jobs. AR 402.

In response to the ALJ's second hypothetical question which added the mental limitations of non-examining physician Dr. Harrison's opinion (AR 211-14) to the physical limitations of the first hypothetical question, the VE testified that there would still be simple, three step jobs where plaintiff would not have contact with the public. AR 403. Plaintiff's attorney again stipulated that there would be plenty of jobs. AR 403.

////

14

In response to the third hypothetical question, the VE testified that based on the moderate mental limitations imposed in the opinion of Dr. Canty (AR 276-78) in addition to the physical limitations, plaintiff would still be able to do simple jobs in a warehouse where he has little contact with others. AR 403-04.

In the ALJ's fourth hypothetical, if the plaintiff's level of functioning were "episodic," the VE testified that if plaintiff's episodes of being unable to work occurred for one day per quarter, he would probably still be employable, but stated that if the episodes lasted for weeks, he would be unemployable. AR 405, 406. Furthermore, the VE testified that if plaintiff had to lie down for 45 minutes to an hour, 2 to 3 times a day as he testified, he would be unable to work. AR 406.

The ALJ's fifth hypothetical (AR 406-407) was based on the physical limitations that plaintiff alleged in his testimony. AR 368-73. The VE testified that plaintiff would still likely be limited to sedentary work. AR 407. The ALJ's sixth hypothetical supposed that because of plaintiff's post traumatic stress and bipolar syndrome, plaintiff would isolate himself for months at a time. AR 407-08. The VE testified that he would not be employable. AR 408.

IV.    ISSUES PRESENTED

In his complaint, plaintiff contends that the denial of his disability benefits was erroneous because (1) the ALJ erred in failing to analyze plaintiff's case as a borderline age situation and as a result failed to find plaintiff disabled under Medical-Vocational Rule 201.09; (2) the ALJ failed to follow the instructions in the order from the Appeals Council when he failed to consider evidence from plaintiff's treating source, failed to evaluate the statements of plaintiff's sister, and failed to ask the VE all of the required questions; (3) the ALJ rejected plaintiff's testimony regarding his functional limitations without providing clear and convincing reasons for doing so; and (4) the ALJ's residual functional capacity ("RFC") finding failed to properly credit the testimony of the VE in response to the hypothetical which accurately reflected the impact of plaintiff's depressive episodes. Pl.'s Mot. for Summ. J. at 24.

V.    LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

VI.    ANALYSIS

A.    Failure to Consider Case as a Borderline Age Case

Plaintiff first contends the ALJ erred in failing to analyze his case as a borderline age case and therefore in not finding him disabled under Medical-Vocational Rule 201.09. Pl.'s Mot. for Summ. J. at 24. Plaintiff argues that because he was less than two months shy of age 50 as of the date of the ALJ's decision, he should have been considered in the age 50-54 "closely approaching advanced age" category. *Id.* Plaintiff contends that even though his case "presented a text book 'borderline age' situation," the ALJ failed to discuss the significance of his borderline age and failed to analyze whether to apply the higher age category. *Id.* at 25.

According to plaintiff, had the ALJ properly analyzed his case as a borderline age situation and considered his numerous adverse factors, "the ALJ would have been compelled to utilize the higher 50-54 age. If this required analysis had occurred, and the ALJ's RFC finding had been applied to the appropriate 50-54 age category, Medical-Vocational Rule 201.09 would have directed a finding that [plaintiff] was disabled." *Id.* at 26.

Defendant counters that the ALJ properly applied the Medical Vocational Guidelines ("Grids") and was not required to use the next higher age category to determine if plaintiff was disabled. Def.'s Mot. for Summ. J. at 7. According to defendant, the ALJ did not "mechanically apply" the age categories, but instead obtained testimony from the VE to determine whether plaintiff retained the capacity for work.[7] *Id.* at 8.

The Grids are used "in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work." 20 C.F.R. Part 404, Subpt. P, App. 2 § 200(a). The Grids "reflect the analysis of the various vocational factors (i.e., age, education, and work experience) in combination with the individual's residual functional capacity (used to determine his or her maximum sustained work capability for sedentary, light, medium, heavy, or very heavy work) in evaluating the individual's ability to engage in substantial gainful activity other than his or her vocationally relevant past work." *Id.*

The age categories are not to be applied "mechanically" in a borderline situation; if a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [he/she is] disabled, [the ALJ] will consider whether to use the older age category after evaluating the overall impact of all the

---

[7] Defendant also argues that "[p]laintiff is free to reapply and allege disability from the date that he attained the higher age category. The final decision at issue in this case does not speak to Plaintiff's disability status after November 13, 2006." Def.'s Mot. for Summ. J. at 12.

factors of [the claimant's] case." 20 C.F.R. §§ 404.1563(b), 416.963(b).

Here, although plaintiff entered a higher age category when he turned 50 years old in January 2007, he technically still fell in the age 45-49 category at the time of the ALJ's decision on November 13, 2006. AR 19-33; *see* 20 C.F.R. §§ 404.1563(c)-(d), 416.964(c)-(d) (2007); *Russell v. Bowen*, 856 F.2d 81, 83-84 (9th Cir. 1988) (stating that the relevant age is the age at the time of the Commissioner's final decision). However, plaintiff was "within . . . a few months of reaching an older age category" since he was only two months shy of age 50 at the time. Therefore, if using the age 50-54 category rather than the age 45-49 category would have resulted in a determination or decision that plaintiff was disabled, the ALJ needed to "consider whether to use the older age category after evaluating the overall impact of all the factors of [plaintiff's] case." 20 C.F.R. § 404.1563(b).

Unlike a person in the age 45-49 category, according to Medical-Vocational Rule 201.09, a person who is age 50-54, is limited to sedentary work, has limited or less education, and has only unskilled or no prior work experience, should be found to be disabled. 20 C.F.R. Part 404, Subpt. P, App. 2, Table No. 1. Because the ALJ found that plaintiff was limited to sedentary work, had limited education, and had only unskilled prior work experience, if the ALJ had used the age 50-54 category, plaintiff would have been found to be disabled. AR 32. Therefore, the ALJ was required to consider whether to use the older age category. 20 C.F.R. § 404.1563(b); *Schiel v. Comm'r of Soc. Sec.*, 267 Fed. Appx. 660, 661 (9th Cir. Feb. 21, 2008). The ALJ needed to "determine based on whatever evidence is available which of the categories on either side of the borderline best describes the claimant," and "[l]ike any factual issue, a finding regarding the appropriate age category in which to place a claimant must be supported by substantial evidence." *Daniels v. Apfel*, 154 F.3d 1129, 1135 (10th Cir. 1998) (remanding for a determination of whether a plaintiff who was sixty-five days short of the advanced age category should have been considered in that age category); *Kane v. Heckler*, 776 F.2d 1130, 1132-34 (3d Cir. 1985) (remanding a claimant's case for further consideration where the ALJ did not address

20 C.F.R. § 404.1563(b) and did not consider which age category best suited the borderline claimant); *Russell v. Comm'r of Soc. Sec.*, 20 F. Supp.2d 1133, 1135, 1136 (W.D. Mich. 1998) (remanding to the ALJ to consider whether a claimant who was 92 days short of his 50th birthday on the date of the ALJ's decision should have been considered in the age 50-54 category, and stating "[W]hen a borderline situation is presented, a factual determination must be made as to the appropriate age category. To do otherwise is to mechanically apply the age categories, an action prohibited by 20 C.F.R. § 404.1563(a). . . . The ALJ's failure to explain his choice of age category in a borderline situation both impedes judicial review of the ALJ's application of 20 C.F.R. § 404.1563(a) and appears to violate 20 C.F.R. § 404.953, which requires that decisions include 'findings of fact' and 'reasons for the decision.'"); *but see Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400, 401 (6th Cir. 2008) (finding that the ALJ was not required "to address age categorization explicitly in borderline situations" but also stating that "substantial evidence might be lacking where an ALJ, with no explanation, places a claimant in the "younger individual" age category who is 49 years and 11 months, unskilled, sedentary, barely literate, and whose only previous work experience was in the fishing industry").

It does not appear from the ALJ's opinion that he evaluated which age category to use for plaintiff. Although he contemplated plaintiff's "age, educational; background, work experience, and residual functional capacity" (AR 31), he did so only in applying Medical-Vocational Rule 201.19 (which applies to claimants in the age 45-49 category), and not in determining what age category to use. It appears the ALJ assumed that because plaintiff was technically age 49, he should only be considered in the age 45-49 category. The ALJ did not mention during the hearing or in his written decision the higher age category or plaintiff's proximity to the higher age category. Instead, when questioning the VE during the hearing, the ALJ stated, "Born in '57 so he's not quite 50 yet, so we don't have that benefit for him." AR 401.

The Grid, and specifically here, Rule 201.19 of the Sedentary Table, was applied by the ALJ as a "framework." Presumably that term is intended to account for the fact that the Grids,

which draw distinctions between the physical ability to do "medium," "light" and "sedentary" work activity, apply to exertional impairments but do not address or have application to non-exertional impairments such as the functional limitations caused by severe episodes of depression from bipolar disorder.  Focusing solely on the exertional aspects of plaintiff's claim, a determination of which side of the borderline best describes plaintiff is material.  Indeed, as to the exertional impairments alone, that question is decisive.  Yet, the question was not meaningfully addressed.  The error is compounded when the non-exertional limitations are considered in combination with the exertional impairments.

There is no indication that the ALJ or the VE specifically considered, or made a factual determination as to, whether to apply the higher age category, even though plaintiff had additional vocational adversities besides his age.  Without a record of the ALJ's reasoning regarding plaintiff's "borderline age," it is impossible for this Court to determine that the ALJ expressly considered which age category to use, as required by § 404.1563(b).  Normally, such an error would justify remand for further consideration of the issue.  *See Schiel*, 267 Fed. Appx. at 661 ("The hearing transcripts and ALJ decision do not reflect consideration of Schiel's borderline age status.  Although the ALJ sought testimony of a vocational expert, he directed the expert not to consider age in his testimony.  Moreover, the discussion section of the ALJ's decision makes no mention of 20 C.F.R. § 404.1563(b) or the claimant's one-month proximity to 'person of advanced age' status under 20 C.F.R. § 404.1563(e).  For these reasons, the record does not provide sufficient basis for review."); *Hanks v. Astrue*, 2008 WL 4059877, at *4 (D. Colo. Aug 29, 2008) (remanding to the ALJ to consider whether an individual who was three months and four days short of entering the "closely approaching advanced age" category should have been considered in the later category); *Carter v. Barnhart*, 2003 WL 22749253, at *7 (N.D. Cal. Nov. 14, 2003) (remanding to the ALJ for a determination of whether a plaintiff who was slightly shy of the next age category qualified for benefits as a "borderline" claimant); *Hilliard v. Schweiker*, 563 F. Supp. 99, 101, 102 (D. Mont. 1983) (remanding case involving an individual

who was three months shy of age 55 at the time of the ALJ's decision since "[t]he record [was] devoid of the consideration, if any, given by the ALJ to the borderline situation which [the plaintiff's] situation obviously present[ed]").  However, despite the ALJ's error, the court need not remand for reconsideration of this issue since the court remands for payment of benefits on alternative grounds, as stated below.  Nonetheless, the fact that the Grids would have directed a finding of disabled if plaintiff had been considered in the age 50-54 category underscores the appropriateness of this court's ruling.

B.      Plaintiff's Credibility and Third Party Statement

Plaintiff also contends the ALJ erred by rejecting plaintiff's testimony regarding his functional limitations without providing clear and convincing reasons for doing so.  Pl.'s Mot. for Summ. J. at 30.  Plaintiff contends that because the ALJ acknowledged that plaintiff had severe impairments that could cause him to experience pain and other subjective limitations, the ALJ could not simply discredit his testimony because he did not believe the alleged degree of plaintiff's pain and limitations; according to plaintiff, without evidence of malingering, the ALJ was required to make specific findings stating clear and convincing reasons for discrediting plaintiff.  *Id.* at 32-34.

Defendant responds that "the ALJ properly assessed Plaintiff's allegations of subjectively disabling symptoms such as pain" and "gave specific and convincing reasons in support of his finding that Plaintiff's allegations were not credible."  Def.'s Mot. for Summ. J. at 16.  Defendant contends that in finding that plaintiff's allegations of disabling pain and other subjective symptoms were "not totally credible," the ALJ "pointed to the minimal clinical findings (AR 29), conservative treatment such as office visits and medication alone (AR 29), the lengthy gap in medical treatment (AR 29), Plaintiff's wide range of daily activities (AR 29), and non-compliance with treatment (AR 29)."  *Id.* at 17.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ's discretion if the ALJ used the proper process and provided proper reasons.  *See, e.g.,*

*Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. *Albalos v. Sullivan*, 907 F.2d 871, 873-74 (9th Cir. 1990); *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

The Ninth Circuit recently reiterated the two-step analysis that an ALJ must engage in when determining whether a claimant's testimony regarding subjective pain or symptoms is credible:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir.1991) (en banc) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir.1996). "Thus, the ALJ may not reject subjective symptom testimony ... simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." *Id.*; *see also Reddick*, 157 F.3d at 722 ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").
>
> Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see also Robbins*, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). To support a lack of credibility finding, the ALJ must "point to specific facts in the record which demonstrate that [the claimant is in less pain or the claimant's symptoms are less severe] than she claims." *Vasquez v. Astrue*, 547 F.3d 1101, 1105 (9th Cir. 2008).

////

Here, the ALJ did not provide clear and convincing evidence for rejecting plaintiff's credibility regarding the symptoms of his mental disorders, did not point to specific facts in the record demonstrating that plaintiff's symptoms are less severe than he claims, and failed to consider the testimony of plaintiff's sister, which addressed those very symptoms.

Plaintiff testified, *inter alia*, that he sometimes has "meltdown" periods in which he is unable to leave his house. AR 362, 363. He stated that at times he excludes himself "from the world at large and just kind of hide[s] out for months on end" because he is afraid to go anywhere. AR 367; *see also* AR 100 ("I have fear a lot of times. Sometimes I'm afraid to leave the house so I can't go to work. I'm depressed a lot and am constantly fearful."). The credibility of these statements was critical to the disability determination in plaintiff's case. The ALJ, who assumed that the statements were not credible, relied on the VE's conclusion that plaintiff would be employable based on the limitations set forth in the ALJ's third hypothetical. However, the VE specifically testified that if plaintiff's episodes of being unable to work lasted longer than one day or occurred more frequently than once per quarter, plaintiff would be unemployable. AR 405, 406, 408.

The medical evidence showed that, in addition to various physical conditions, plaintiff suffered from bipolar disorder, depression, and adjustment disorder, any of which could reasonably have caused plaintiff to have depressive episodes in which he suffered the type of symptoms he complained of, and that he consistently had a GAF of approximately 50-55. Specifically, plaintiff's testimony regarding his depressive episodes was largely consistent with the opinion of Dr. Canty, who concluded that plaintiff's "history is consistent with frequent episodes of major depression occurring four to six times per year which have not remitted with extensive psychiatric care and abstinence from alcohol." AR 275.

Because there was no evidence of malingering, the ALJ could therefore only reject plaintiff's testimony regarding his depressive episodes "by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281. Even though plaintiff's statements

were critical to his case, the ALJ did not make an explicit finding that is supported by "a specific, cogent reason" for his disbelief of plaintiff nor did he identify specific testimony that undermines plaintiff's complaints about his depressive episodes. *Rashad*, 903 F.2d at 1231; *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) ("In making a credibility determination, the ALJ 'must specifically identify what testimony is credible and what testimony undermines the claimant's complaints[.]'"). The ALJ concluded that plaintiff's "allegations regarding his limitations are not totally credible" because "the records [did] not show the presence of a severe mental impairment over any 12 month period resulting in at least a marked impairment in daily activities, social functioning, or concentration" and because "the medical evidence failed to support the intensity of [plaintiff's] symptoms, and aggravating factors." AR 32, 29. The ALJ stated that the "evidence consistently shows that the claimant's subjective complaints are much worse than the objective findings as evidence[d] by the record." AR 29. Defendant also contends that the ALJ rejected plaintiff's credibility based on "the minimal clinical findings" supporting plaintiff's contention that he cannot work, plaintiff's "conservative treatment such as office visits and medication alone, the lengthy gap in medical treatment, Plaintiff's wide range of daily activities, and [plaintiff's] non-compliance with treatment." Def.'s Mot. for Summ. J. at 17 (citing AR 29).

However, it appears from the ALJ's decision that his references to "minimal clinical findings," as well as his statements regarding conservative treatment, a gap in medical treatment, plaintiff's wide range of daily activities, and plaintiff's non-compliance with treatment, all related to plaintiff's physical, rather than mental, limitations and therefore did not constitute "clear and convincing reasons" why the ALJ rejected plaintiff's testimony about his bi-polar disorder and depressive episodes and their impact on his ability to function. AR 29. Those reasons are stated in the ALJ's decision before the ALJ begins discussing plaintiff's mental limitations. *Id.* The reference to "minimal clinical findings" commences a paragraph in which the ALJ discusses only plaintiff's *physical* conditions. The reference to plaintiff's lack of

emergency room reports, surgeries, hospitalizations, trigger point injections, acupuncture, or chiropractic treatment was specifically in connection with plaintiff's *physical* ailments. And the ALJ's statement regarding plaintiff's non-compliance with treatment at Del Norte Clinic could not provide clear and convincing evidence regarding plaintiff's lack of credibility about his mental symptoms because plaintiff's treatment at Del Norte Clinic was only for his *physical* ailments. AR 29. At the same time that he was treated and then discharged from Del Norte, plaintiff was also receiving treatment with medications for his mood disorder from Sutter-Yuba Mental Health Service. AR 169-96.

Moreover, as discussed above, there was objective medical evidence that plaintiff had an impairment which could reasonably be expected to produce his depressive episodes – therefore, any reference to "minimal clinical findings" with regard to plaintiff's mental limitations is unsupported by the record. Further, it is not clear that the ALJ's statement that the medication evidence was devoid of any further records for an extended amount of time and his statement that plaintiff had been off his medications for nine months are supported by the record, or that any decision to not get medical treatment or get off medication was optional. *See* AR 343 (plaintiff on medication as of 1/11/06); 346 (plaintiff on medication for bipolar disorder and ADD until 2005); 377 (plaintiff on medication as of the July 2004 hearing); 394, 396 (plaintiff on medication as of the August 2006 hearing); 398 (ALJ indicating that plaintiff "continued treatment for psychiatric care and has done that for three years now, almost four, . . . and he's under a lot of medications"); *see also* 324 (plaintiff indicating that he was trying to get a doctor but was having a difficult time since "noone takes CMSP and those who do have up to 18 mo waiting list"). Regardless, such statements by the ALJ do not provide a clear and convincing reason to reject plaintiff's testimony about his depressive episodes, since Dr. Canty made clear that plaintiff's depressive episodes do not remit even with extensive psychiatric care, abstinence from alcohol, and medication, and plaintiff has stated that even on medication he feels paranoid and afraid to leave the house at times. AR 275, 349. Plaintiff also stated in January 2006 that

even when he is on medication, he "will still have stages where [he is] paranoid and afraid to leave the house. It can go on for a week. At one point [he] was in bed for four months." AR 349.

Finally, the fact that plaintiff engaged in a wide range of activities also does not provide a clear and convincing reason for the ALJ to reject plaintiff's credibility regarding his depressive episodes. The ALJ noted that plaintiff "attends AA meetings three times a week, . . . does his laundry, takes care of his dog and he is the manager of a halfway house. He takes residents to their appointments and he shops for the house every two weeks." AR 29.[8] Plaintiff's ability to engage in those activities is not inconsistent with his testimony regarding his depressive episodes since the activities are relatively minimal and since plaintiff has acknowledged that the episodes only occur periodically and therefore would not impact his ability to engage in some limited activities during times when plaintiff is not in such an episode. "[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations. . . . Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citing *Cohen v. Secretary of Dept. of Health & Human Services*, 964 F.2d 524, 530-531 (6th Cir. 1992) (ruling that a claimant should not be penalized for attempting to maintain some sense of normalcy in her life); *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (noting that a disability claimant need not "vegetate in a dark room" in order to be deemed eligible for benefits); and *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("Many home activities are not easily transferable to . . . the more grueling environment of the workplace, where it might be

---

[8] It appears that plaintiff no longer resides at the halfway house and that even when he did, his duties there were much more limited than the term "manager" suggests. AR 398-99, 340 (Letter from Steve Gibbs, the owner of the halfway house, which indicated that as of February 2005, plaintiff had been living free of charge at the halfway house for "the last couple of years," and that at no time did plaintiff ever receive "any payment from me or anyone else to my knowledge for any work." Mr. Gibbs indicated that plaintiff "answers the phones and watches the house for me in exchange for his room and board. To my knowledge, because of mental and physical health issues, he is unable to hold a job.").

impossible to periodically rest or take medication.")).

The ALJ did not specifically acknowledge plaintiff's testimony that he has "meltdown" periods in which he is unable to leave his house for weeks to months at a time, and did not specifically indicate why he disbelieved that testimony, even though the testimony was consistent with the medical evidence. The ALJ did not point to specific facts in the record which demonstrate that plaintiff's symptoms are less severe than he claims. *Vasquez*, 547 F.3d at 1105. Therefore, the ALJ improperly rejected plaintiff's testimony as to the severity of his symptoms.[9]

This error was magnified by the ALJ's failure to consider the statements of plaintiff's sister, Bonnie Bell, which were consistent with plaintiff's testimony regarding his depressive episodes, even though the ALJ was directed to do so by the Appeals Council.[10] *See* Pl.'s Mot. for Summ. J. at 28. On a third-party questionnaire, Bonnie Bell reported, *inter alia*, that plaintiff

---

[9] It appears the ALJ may have taken into consideration his personal experiences with bipolar disorder and his impressions of individuals with the disorder when evaluating plaintiff's credibility. *See*, *e.g.*, AR 367 ("I'm real familiar with bipolar disorder, my oldest kid's bipolar. He managed to get through college and now he's working."); 374-75 ("[M]y son wrote a book called the *Bipolar Disorder Manual*"); 398 ("so many people have controlled [bipolar disorder] throughout their lifetime"); 405 ("What makes this particularly interesting is my oldest son is bipolar, so I'm infinitely familiar with it and it's, it's one of those deals, it's – and actually somebody that's been treated for quite a while, if the treatment is working pretty well, actually that's what happens, they'll have an episode and maybe not even last 24 hours, they may go to the ER or, you know, they won't necessarily be put back in. You know, there may be a time at some point where he's in for a week or something like that . . . ."); 408-09 (conversation between ALJ and VE about numerous "outstanding," "highly intelligent" people who are bipolar).

[10] Plaintiff also argues that the ALJ erred by failing to follow the Appeals Council's instructions to secure additional evidence from plaintiff's treating medical source and to appropriately question the VE regarding specific jobs available to plaintiff and any potential conflicts between those jobs and the DOT. Pl.'s Mot. for Summ. J. at 26-29. In light of the court's ruling below, the court need not decide whether it can review the ALJ's failure to comply with the remand order or whether the ALJ erred by failing to secure additional evidence from plaintiff's treating medical source or by failing to appropriately question the VE.

Nonetheless, it is worth noting that the VE did not provide any specific examples of jobs available to plaintiff and did not indicate whether those jobs conflicted with the DOT, as required by Social Security Ruling 00-4 and *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007). Social Security Ruling 00-4p, at *4, available at 2000 WL 1898704 (when a VE "provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE['s] evidence and information provided in the DOT.").

could not seem to hold a job for any amount of time and had to take medication to sleep; that plaintiff got nervous when he went out of the house so he did not go out unless it could not be avoided, and some days he was too afraid to leave the house at all; that his disabilities affected his memory, ability to complete tasks, and concentration; that his mental state is bad; and that he is afraid of a lot of things and of being around people in public. *Id.* (citing AR 88, 91-94).

"[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); *see also Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993) (friends and family members in a position to observe a plaintiff's symptoms and daily activities are competent to testify to condition); 20 C.F.R. § 404.1513(d)(4) (providing that evidence provided by lay witnesses may be used to show "the severity of [a claimant's ] impairment(s) and how it affects [the claimant's] ability to work"). "If the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness." *Dodrill*, 12 F.3d at 919; *see also Bruce v. Astrue*, 2009 WL 539945, at *1 (9th Cir. Mar. 5, 2009) (finding that the ALJ erred in rejecting, without sufficient comment, the lay witness testimony of the plaintiff's wife); *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (finding that the ALJ erred by failing to consider the lay testimony of two witnesses about how the plaintiff's impairments affected his ability to work).

"[T]he rule for lay witness testimony depends on whether the testimony in question is controverted or consistent with the medical evidence. If it is controverted, then the ALJ does not err by ignoring it. . . . If, however, lay witness testimony is consistent with the medical evidence, then the ALJ must consider and comment upon it." *Timmons v. Comm'r of Soc. Sec.*, 546 F. Supp. 2d 778, 795-96 (E.D. Cal. 2008). The ALJ must consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that are not shown by the medical evidence. *See Smolen*, 80 F.3d at 1288.

////

Defendant contends that to the extent the ALJ erred by not discussing Ms. Bell's statement, it constituted "harmless error." Def.'s Mot. for Summ. J. at 12. However, where the ALJ fails to discuss competent lay testimony that is favorable to plaintiff, the error is harmless only if the court can confidently conclude that no reasonable ALJ, when fully crediting testimony, could have reached a different disability determination. *Stout*, 454 F.3d at 1054 ("If fully credited, the lay testimony supports a conclusion that Stout's mental impairments render him in need of a special working environment which, particularly when considering the VE's testimony, a reasonable ALJ could find precludes Stout from returning to gainful employment. Consequently, the ALJ's error in failing to provide reasons for rejecting it was not harmless."); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) ("[I]f credited, the testimony of Robbins's son adds substantial weight not only to Robbins's claim, but also to the testimony of Robbins's wife and daughter, which support Robbins's claim. Because the ALJ did not make a legally sufficient adverse credibility finding with regard to Robbins's own testimony, we cannot say with respect to [the testimony of Robbins's son] that 'no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.'").

Plaintiff's sister's statements were not controverted by the medical evidence. Although the ALJ found that the medical evidence did not support the intensity of plaintiff's symptoms (AR 29), the medical evidence does not contradict any of plaintiff's sister's statements. To the contrary, many of plaintiff's sister's statements are consistent with the conclusions of Dr. Canty and other mental health experts (specifically, that plaintiff's "history is consistent with frequent episodes of major depression," that plaintiff's "ability to understand, remember and carry out instructions was affected by his impairments," and that "plaintiff's ability to respond appropriately to supervision, co-workers and work pressures in a work setting was impaired"). AR 276-77.

Plaintiff's sister's statements also corroborate many of plaintiff's statements regarding his daily activities and symptoms; specifically, that plaintiff could not seem to hold a job for any

29

amount of time and had to take medication to sleep; that plaintiff got nervous when he went out

of the house so he did not go out unless it could not be avoided, and some days he was too afraid

to leave the house at all; that his mental state is bad; and that he is afraid of a lot of things and of

being around people in public. Moreover, the VE testified that if plaintiff's episodes last more

than a day at a time or occurred more often than every couple months, he would not be

employable. AR 404-05. Then, when plaintiff's attorney reminded the ALJ and the VE at the

hearing that plaintiff had previously testified "that he would have episodes that last for weeks

where he does not leave the house [and] doesn't get in the car" and pointed out that plaintiff's

sister also verified that too by her statements, the VE testified that those functional limitations

would make plaintiff unemployable. AR 406. Accordingly, the ALJ's failure to discuss the

corroborating statements from plaintiff's sister cannot be deemed harmless.

"Where the ALJ improperly rejects the claimant's testimony regarding his limitations,

and the claimant would be disabled if his testimony were credited, we will not remand solely to

allow the ALJ to make specific findings regarding that testimony." *Lester*, 81 F.3d at 834

(quoting *Varney v. Sec'y of Health and Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988)

(internal quotations omitted)). "Rather, that testimony is credited as a matter of law." *Id.*

If plaintiff's testimony is credited, it is clear from the VE's testimony that plaintiff is not

employable. AR 405, 406, 408. Since plaintiff is not employable, he should be considered

disabled. *Lester,* 81 F.3d at 828, n.5 ("Step five: Does the claimant have the residual functional

capacity to perform any other work? . . . If not, the claimant is disabled."). Accordingly, the

court will not remand for further findings because "no useful purpose would be served by further

administrative proceedings." *Varney*, 859 F.2d at 1399; s*ee also Pitzer*, 908 F.2d at 506 (the

decision whether to remand a case for additional evidence or simply to award benefits is within

the discretion of the court). Instead, this court will remand for entry of judgment directing the

payment of benefits. *See Smolen*, 80 F.3d at 1292 (holding that where (1) the ALJ has failed to

provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues

that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited, those conditions warrant a remand for an award of benefits rather than for further proceedings).

C.    Failure to Credit Testimony of VE

Finally, plaintiff contends the ALJ's RFC finding failed to properly credit the testimony of the VE in response to the hypothetical which accurately reflected the impact of plaintiff's depressive episodes. Pl.'s Mot. for Summ. J. at 34. Because the ALJ improperly discredited plaintiff's testimony, it was erroneous for him to rely on the hypothetical that he did as the basis for his 2006 decision. *Embrey v. Bowen*, 849 F.2d 418, 422-23 (9th Cir. 1988) (hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence). Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant. *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989). If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value. *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991). If the ALJ had not improperly discredited plaintiff's testimony, he would have had to rely on the sixth hypothetical, in which he asked the VE whether plaintiff would be employable if he isolated himself for months at a time. AR 407-08. The VE's response to that hypothetical was that plaintiff would not be employable. AR 408. As discussed above, these errors by the ALJ require the court to remand this case for payment of benefits.

VII.    CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment or remand is granted,

2. Defendant's cross-motion for summary judgment is denied, and

////

1    3. This action is remanded to the Commissioner for entry of judgment directing the

2    payment of benefits.

3    DATED: March 23, 2009.

                    EDMUND F. BRENNAN
                    UNITED STATES MAGISTRATE JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26